UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **EYE CENTERS OF AMERICA, LLC** ) <br> **d/b/a RETINA CENTER OF NEW** ) <br> **JERSEY, LLC,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **SERIES PROTECTED CELL 1, A** ) <br> **SERIES OF OXFORD INSURANCE** ) <br> **COMPANY TN, LLC,** ) <br> ) <br> **Defendant.** ) | **Case No. 3:21-cv-00333** <br> **Judge Aleta A. Trauger** |

# MEMORANDUM

Series Protected Cell 1, a Series of Oxford Insurance Company TN, LLC ("Oxford") has filed a Motion for Judgment on the Pleadings (Doc. No. 22), to which Eye Centers of America, LLC d/b/a Retina Center of New Jersey, LLC ("Retina Center") has filed a Response (Doc. No. 31), and Oxford has filed a Reply (Doc. No. 33). For the reasons set out herein, the motion will be granted.

## I. BACKGROUND

Retina Center is a New Jersey-based company that provides medical services. Although the Complaint itself provides few details regarding Retina Center's actual business, the company explains in its briefing that "Retina Center is a team of seven physicians, at five separate locations, exclusively specializing in the treatment of diseases of the retina, vitreous, and macula. It provides concentrated retinal care, diagnosis, surgery, and treatment throughout the State of New Jersey." (Doc. No. 31 at 3.) Oxford is a Tennessee-based insurance company that issued Retina Center an Actual Net Loss Insurance Policy for a policy period of December 31, 2019 through December 31,

2020. (Doc. No. 1 ¶¶ 3–5, 19; Doc. No. 1-1 (policy).) The policy, which included a choice-of-law provision stating that the policy is to be governed by Tennessee law, provided coverage for expenses and lost income attributable to certain occurrences—referred to as "scheduled events" because they appeared on the policy's schedule of coverage—such as crime, data breach, and liability in employment-related litigation. (Doc. No. 1-1 at 4, 36.)

The structure of the policy, as drafted, was that the standard policy document included a lengthy list of defined types of events for which an insured party *could* purchase coverage, and the insured's actual purchased policy document included a Declaration identifying which of those types of coverage the insured party had elected to purchase. (*See* Doc. No. 1-1 at PageID #15, 6–29.) One of the scheduled events for which Retina Center purchased coverage was "Loss of Referrals," which the policy defined as follows:

    a. the wrongful termination or wrongful cancellation by a **Key Referral Source** of all or any part of a business relationship between Insured and such **Key Referral Source**; or

    b. the termination or cancellation of all or any material part of a business relationship between Insured and a **Key Referral Source** as a result of:

        i. the cessation or suspension of the business operations of such **Key Referral Source** for a period no less than 60 days;

        ii. if an individual, the death of such **Key Referral Source**;

        iii. if an individual, the bodily injury to or illness suffered by such **Key Referral Source**, resulting in such **Key Referral Source's** inability, for a period no less than 60 days, to perform the same type of work that such **Key Referral Source** performed prior to the bodily injury or illness;

        iv. the bankruptcy of such **Key Referral Source**;

        v. the merger or consolidation with another organization such that the **Key Referral Source** is not the surviving organization, or the acquisition of more than 50% of the ownership interest of the **Key Referral Source**

> > by another organization, or person, or group of organizations and/or persons acting in concert; or
>
> > vi. the adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body, executive authority or agency, affecting such **Key Referral Source's** business and resulting in increased costs or operating expenses, reduction in the **Key Referral Source's** business production capacity, or the **Key Referral Source's** withdrawal of a product or service from the market.
>
> **Actual Net Loss** in connection with a Loss of Referrals event shall include **Income Loss** and **Extra Expenses**, including costs of cover, costs of advertising and marketing for new referral sources, travel, lodging, meal and entertainment expenses incurred in selection of a replacement **Key Referral Source**, and miscellaneous extra costs incurred in finding, meeting and negotiating with new referral sources including costs to verify the background and references of prospective new referral sources, and overtime pay and legal expenses incurred to draw up referral contracts.

(*Id.* at 22–23.) A "Key Referral Source" was defined as any third party who either (1) regularly directed referrals to Retina Center accounting for 10% or more of the Center's annual gross revenue or (2) regularly directed referrals to Retina Center in some amount and was explicitly identified in the policy as a Key Referral Source. (*Id.* at 5.) Retina Center's policy identified six particular individuals as Key Referral Sources. (Doc. No. 1 ¶ 13.) According to the briefing, those individuals operated "general ophthalmic and optometric practices" and referred patients to Retina Center for "dealing with" certain "diseases of the eye." (Doc. No. 23 at 1.)

"Income Loss," as the term was used to calculate any losses related to lost referrals, was defined as

> Loss of net profit (before taxes) that would have been earned by **Insured** during the **Period of Restoration**[1] in the absence of the **Scheduled Event**, taking into account the actual experience of **Insured's** business before the **Scheduled Event** and the probable experience **Insured** would have had without the **Scheduled Event**.

---

[1] The "Period of Restoration" was defined as "[t]he time frame beginning on the date of the **Scheduled Event** and ending on the earlier of: [1] the date that **Insured** is able to produce goods and provide services at the same level, efficiency and speed as before the **Scheduled Event**; [or] [2] twelve months from the date that the **Scheduled Event** first occurs." (Doc. No. 1-1 at 5–6.)

(Doc. No. 1-1 at 4.) The other component of Actual Net Loss, Extra Expenses, was defined as the "[r]easonable costs, fees and expenditures actually paid by **Insured** during the **Period of Restoration** for the sole purpose of avoiding, mitigating or otherwise minimizing Income Loss." (*Id.* at 3.)

Among the potential coverage categories listed in the policy document, but for which Retina Center did not, according to the Declaration, purchase coverage, were several categories of "business interruption," defined to mean the "interruption or cessation of **Insured's** business for a period of no less than 24 hours." (Doc. No. 1-1 at 9–10.) One category focused, in particular, on interruptions related to "Civil Authority":

> 8. **"Business Interruption – Civil Authority / Emergency Response Risk"** event, which means the interruption or cessation of business of **Insured** at or from one or more of **Insured's** business locations for a period of no less than 24 hours, caused by a material restriction or prevention of access to or from, or ingress/egress to or from, or use of **Insured's** premises by **Insured**, **Insured's** vendors or suppliers, or **Insured's** customers or clients, resulting from an order, directive, or action by a civilian or government agency or entity, other than a branch of the United States military (or foreign military) or National Guard if activated to federal service (or foreign equivalent). **Actual Net Loss** in connection with a Business Interruption-Civil Authority/Emergency Response Risk event shall include **Income Loss** and **Extra Expenses**.

(*Id.* at 9.)

On March 21, 2020, the Governor of New Jersey, amidst the relatively early days of the COVID-19 pandemic, instituted Executive Order 107, which, according to the Complaint, generally suspended non-emergency medical procedures in the state. (Doc. No. 1 ¶ 18; Doc. No. 1-2.) According to Retina Center, all of the individuals who were identified as Key Referral Sources in the policy were affected by the Order, because all provided non-emergency medical procedures. According to the Complaint, the referral sources' practices were such that complying

4

with Executive Order 107 required, in effect, a "shutdown" of the referral sources' operations. (Doc. No. 1 ¶ 20.)

Oxford, which has filed an Answer to Retina Center's Complaint, disputes Retina Center's characterization of the law in New Jersey in 2020. Specifically, Oxford points out that Executive Order 107 provided that "[n]othing in this Order shall be construed to limit, prohibit, or restrict in any way the provision of health care or medical services to members of the public." (Doc. No. 1-2 at 12.) Rather, according to Oxford, non-emergency medical procedures were actually suspended in the state by the Governor's Executive Order 109, which took effect a few days later, at 5:00 p.m. on March 27, 2020. (Doc. No. 21 ¶ 18; see Doc. No. 21-4.)

Oxford also argues that characterizing the effect of New Jersey's suspension of non-emergency procedures on Retina Center as involving a loss of *referrals* fundamentally misses the point. Oxford suggests that Retina Center's own business is built around providing non-emergency medical procedures, meaning that, during the suspension, its operations would largely have ceased, regardless of whether anyone was being referred to it by the Key Referral Sources. Any loss from that period, Oxford argues, was not because Retina Center lacked in referrals, but because, whether or not there were referrals, Retina Center was unable to render services. Oxford further points out that Retina Center could have purchased coverage that would have compensated it for losses based on the suspension of its own operations, but it chose not to do so. Oxford suggests that Retina Center is now attempting to, in effect, circumvent that misstep by improperly recharacterizing its losses as referral-related. (Doc. No. 23 at 4–5.)

The Complaint itself does little, if anything, to explain how or why Retina Center would have been capable of remaining open during the pendency of Executive Orders 107 and 109, other than by stating that, "in order to remain open . . . , [Retina Center] was required to purchase safety

5

equipment to comply with the heightened safety mandates instituted by" the state's coronavirus-related executive orders. (Doc. No. 1 ¶ 28.) In its briefing, however, Retina Center asserts that it "only performs emergency and medically necessary surgeries" and therefore "was not required by Executive Order to suspend any of its activities." (Doc. No. 31 at 15 (emphasis omitted).)

On May 15, 2020, the Governor of New Jersey issued a new executive order, Executive Order 145, which permitted non-emergency medical procedures to resume on May 26, 2020. (Doc. No. 1 ¶ 21; Doc. No. 1-3.) Although Oxford and Retina Center disagree about the origin of the New Jersey ban on non-emergency procedures, they agree that Executive Order 145 rescinded the ban and that it went into effect, in relevant part, on May 26, 2020. (Doc. No. 21 ¶¶ 18–21.) Executive Order 145, however, required the providers of non-emergency medical procedures to adopt certain policies to ensure the safety of their operations to the extent reasonably possible. Instituting those policies took some additional time, and, as a result, none of the Key Referral Sources actually resumed operations on March 26, 2020. (Doc. No. 1 ¶ 22–24.) In its briefing, Oxford argues, in part by reference to evidence outside the Complaint but attached to Oxford's Answer, that the referral relationships between Retina Center and the Referral Sources did not, in fact, ultimately end, but rather resumed once the referrers were back in operation. (*See* Doc. No. 23 at 2; Doc. No. 21-7.)

Nevertheless, Retina Center claims, without elaboration, that "[t]he material part of the business relationship between Retina Center and [its] Key Referral Sources was cancelled due to the cessation and/or suspension of [the] Key Referral Sources' business operations for a period exceeding 60 days." (Doc. No. 1 ¶ 25.) Retina Center appears to be using the word "cancelled" because that term is one of the ones used in the policy; nowhere does Retina Center actually dispute that the referral relationships eventually resumed.

6

Retina Center claims that the referrers' shutdowns qualified as "Loss of Referrals" events under the Oxford policy and that Retina Center suffered a compensable Actual Net Loss in excess of $1,000,000 from those events. (*Id.* ¶ 26.) That alleged loss represented both lost income and the fact that, "in order to remain open and minimize its Income Loss, [Retina Center] was required to purchase safety equipment to comply with the heightened safety mandates instituted by various executive orders New Jersey Governor Phil Murphy instituted in response to the COVID-19 pandemic." (*Id.* ¶ 28.)

In early July of 2020, Retina Center gave Oxford notice that it intended to pursue an insurance claim based on it losses. (*Id.* ¶ 29.) On July 13, 2020, Oxford's independent third-party claims administrator, Creative Risk Solutions, confirmed receipt of the notice and requested additional information. This process went back and forth, with Retina Center providing the requested documentation of its losses, until, during a December 1, 2020, telephone conference, Oxford informed Retina Center that the claim was being denied. (*Id.* ¶¶ 30–34.) According to Retina Center, Oxford explained that it had "concluded that there was no coverage for this claim based upon its determination that the termination or cancellation of all, or the material part of, the business relationship between Retina Center and its Key Referral Sources was not 'permanent.'" (*Id.* ¶ 35.) Retina Centers argued to Oxford that the relevant plan language included no such permanence requirement. Oxford acknowledged that the word "permanent" did not appear in that language, but it nevertheless stood by its interpretation of the provision based on the use of the words "cancellation" and "termination." (*Id.* ¶¶ 37–41.) On December 1, 2020, Oxford confirmed its decision to Retina Center through a denial letter, stating that "the temporary suspension of the business operations of the referral sources did not result in the termination or cancellation of all or

7

Case 3:21-cv-00333   Document 35   Filed 02/01/22   Page 7 of 17 PageID #: 340

any material part of a business relationship between the Insured and any Key Referral Source." (*Id.* ¶ 43; Doc. No. 1-4 at 3.)

Tennessee has, for many years, had a "bad faith refusal to pay" statute imposing increased liability on insurers who fail to process meritorious insurance claims timely and in good faith. *See* Tenn. Code Ann. § 56-7-105. In order for an insured party to avail itself of that statute, however, it must first file a sufficient "formal demand for payment." *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 360 (6th Cir. 2018) (quoting *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986)). To that end, Retina Center sent Oxford a letter on February 19, 2021, demanding payment of the denied claim, reiterating its position regarding Oxford's stated basis for the denial, and informing Oxford that, if the claim was not paid, Retina Center intended to sue Oxford in this court for, among other things, bad faith refusal to pay. (Doc. No. 1 ¶ 44; Doc. No. 1-5 at 2–5.)

Oxford did not reverse its denial decision, and, on April 26, 2021, Retina Center filed its Complaint. (Doc. No. 1.) The Complaint states three causes of action: first, for declaratory judgment establishing Retina Center's coverage under the plan; second, for breach of contract and the duty of good faith and fair dealing; and, third, for bad faith refusal to pay. (*Id.* ¶¶ 45–75.) Oxford now seeks dismissal of all three claims.

## II. LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012). In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor

8

of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" as required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III. ANALYSIS

Oxford has identified three reasons why its denial of Retina Center's insurance claim was correct and why the court should dismiss Retina Center's causes of action. First, Retina Center's relationships with its Key Referral Sources were not, as required by the policy, canceled or terminated, but rather were temporarily suspended. Second, insofar as a temporary suspension of referrals could be sufficient to trigger coverage under the policy, such suspension was required to be at least 60 days in length, which New Jersey's shutdown of non-emergency medical procedures was not. And, third, in any event, there were no losses attributable to the loss of referrals because Retina Center was shut down just as much as its referrers were. Retina Center disputes those grounds for dismissal on the merits but also argues that, in raising its arguments, Oxford has improperly relied on matters outside the pleadings in a manner inconsistent with Rule 12(c).

9

## A. Scope of Court's Consideration

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are [1] presented to and [2] not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). In other words, when a party filing or opposing a Rule 12(b)(6) or 12(c) motion brings up facts that are outside the four corners of the pleadings and not subject to either judicial notice or incorporation by reference into the pleadings, the court has two choices: it can ignore the non-pleaded facts on the ground that they are, by definition, irrelevant to the pending motion, which is confined to testing the pleadings; or, in the alternative, the court can consider some or all of the additional, non-pleaded facts, in which case the court is required to convert the motion to one for summary judgment under Rule 56. If the court chooses the second option, however, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). As long as a district court limits itself to one of the two possibilities contemplated by Rule 12(d), the decision to convert or not to convert a motion is within that court's reasonable discretion. *See Miller v. Mearns*, 643 F. App'x 552, 554 (6th Cir. 2016) (citing *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010)).

In some respects, Retina Center is correct that Oxford, in its briefing, goes beyond the facts covered by the pleadings in a manner that cannot be reconciled with Rule 12(c). For example, Oxford asserts, without citation to the record, that information regarding the referrers' failure to reopen promptly following Executive Order 145's effective date "was never presented to Oxford in connection with [Retina Center's] claim." (Doc. No. 23 at 17.) That may or may not be true, and the failure to present that information to Oxford during the claims process may or may not be fatal to Retina Center's reliance on the same theory now. For the court even to wade into those

10

issues, however, it would have to go beyond the facts asserted in the Complaint, which it cannot do without also giving the parties the opportunity to address the underlying factual dispute as they would on a motion for summary judgment. The court finds that it would not be an effective use of the court's or parties' time to prolong the consideration of this motion by calling for additional briefing in an attempt to comply with Rule 56. Accordingly, factual assertions made by Oxford that exceed the allegations in the pleadings will not be considered by the court.

There are, however, two areas where the court may look beyond the explicit contents of Retina Center's Complaint. The court can rely on judicial notice to consider some facts, particularly regarding the Executive Orders, without the need to convert the motion to one under Rule 56. *See, e.g.*, *Roane Cty., Tenn. v. Jacobs Eng'g Grp., Inc.*, No. 3:19-CV-206-TAV-HBG, 2020 WL 2025613, at *3 (E.D. Tenn. Apr. 27, 2020) (holding that the defendant's citation to certain documents did "not require that the Court convert [the defendant's] motion pursuant to Rule 12(d) because these documents are public records subject to judicial notice"). The power of a court to take judicial notice of executive orders and similar formal executive actions apparent in the public record is well-established. *See, e.g.*, *N.L.R.B. v. E.C. Atkins & Co.*, 331 U.S. 398, 406 (1947) ("Circular No. 15 was not introduced into evidence in the proceeding before the Board. But it was issued by military authorities pursuant to the power vested in the Secretary of War by Executive Order No. 8972 and we may take judicial notice of it."); *Ackman v. N. States Contracting Co.*, 110 F.2d 774, 777 (6th Cir. 1940) ("We take judicial notice of executive orders creating the Board, and administrative action appointing its personnel."); *Fitch v. Kentucky State Police*, No. CIV.A. 3:10-49-DCR, 2010 WL 4670440, at *7 (E.D. Ky. Nov. 10, 2010) ("Additionally, the Court may take judicial notice of this Executive Order."). Accordingly, while the court is required to accept Retina Center's factual allegations and to avoid factual questions that are not fairly raised

by the pleadings, the court is not required to accept Retina Center's characterization of what the Executive Orders actually said or, as a legal matter, did. Nor is the court required to ignore the existence of Executive Order 109 simply because the Complaint incorrectly identifies Executive Order 107 as instituting the relevant policies.

Second, in addition to the court's consideration of what Retina Center *has* alleged in its Complaint, the court is also permitted to examine what Retina Center did *not* allege. In order to satisfy the plausibility requirement that governs Rule 12(c) motions, a complaint must plead "more than a sheer *possibility* that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (emphasis added). It is not sufficient to allege facts that are "merely consistent with" liability while eliding other, more problematic factual issues that are nevertheless essential to the claim. *Id.* (quoting *Twombly*, 550 U.S. at 557). A complaint will not survive a motion under Rule 12(b)(6) or 12(c) unless the plaintiff has pleaded "each element of his claim with sufficient detail." *York v. Lucas Cty., Ohio*, No. 3:13CV1335, 2014 WL 496937, at *1 (N.D. Ohio Feb. 6, 2014) (citing Twobly, 550 U.S. at 555). While the court is bound to accept the plaintiff's assertions of fact, the court is not bound to ignore the plaintiff's omissions.

For example, in this case, Retina Center has conspicuously failed to plead that its relationship with any referrer was ever permanently cancelled. By the time Retina Center drafted its Complaint, it was fully on notice that the issue of permanent cancellation of referral relationships, as opposed to those relationships' temporary suspension, was central to Oxford's denial of Retina Center's insurance claim. Retina Center addresses that issue in the Complaint, but only by arguing that Oxford's interpretation of the policy was wrong—not by arguing that the referral relationships were, in fact, permanently cancelled. While the court will not consider the additional evidence cited by Oxford seeking to *establish* that the referral relationships resumed,

the court is permitted to consider the fact that Oxford never actually alleged that they did not.

**B. Plausibility of Retina Center's Claim for Relief**

Based on the court's reading of the Complaint and Answer, Retina Center is probably correct that the latter two grounds for dismissal identified by Oxford are too fact-dependent for the court to consider at this stage. Even assuming that Oxford is correct that non-emergency medical procedures were not suspended in New Jersey until Executive Order 109 and that the procedures were, therefore, not suspended for a full 60 days, Retina Center has plausibly alleged that the safety requirements of Order 145 had the practical effect of at least slightly extending the shutdown past the 60-day threshold. As to whether Retina Center's losses were attributable to a loss of referrals or, instead, its own alleged shutdown, Retina Center may well have been remiss in declining to actually plead its explanation for how and why it was able to remain open throughout the relevant period. Nevertheless, the Complaint does state that Retina Center remained open, and a reading of the Executive Orders does confirm that the orders did not shut down *every* business in New Jersey. Accordingly, reading the Complaint in the light most favorable to Retina Center, Retina Center adequately pleaded that it could have performed income-generating procedures from referrals during the shutdown, if those referrals had continued.

However, Oxford's first stated ground for denying the claim—that the policy only covered loss of referrals upon the permanent cancellation of the referral relationships—is based on the interpretation of the policy, not on the aforementioned disputed facts. "The question of the extent of insurance coverage is a question of law involving the interpretation of contractual language." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012) (citing *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009)); *see also Charles Hampton's A-1 Signs, Inc. v. Am. States Ins. Co.*, 225 S.W.3d 482, 487 (Tenn. Ct. App. 2006) ("The interpretation

13

of an insurance policy is a question of law and not fact.") (citation omitted). Moreover, as the court has already noted, the only rebuttal to this aspect of Oxford's position that appears in the Complaint is the *legal* argument that Oxford misinterpreted the policy. Retina Center has not pleaded a factual basis for concluding that the denial of the claim was in error even if Oxford's legal interpretation was correct. The court, accordingly, can consider whether Oxford is entitled to dismissal on the ground that its reading of the policy's language should prevail, without being waylaid by the factual disputes surrounding the other potential grounds for dismissal.

Insurance policies "are 'subject to the same rules of construction as contracts generally,' and in the absence of fraud or mistake, the contractual terms 'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'" *Clark*, 368 S.W.3d at 441 (quoting *U.S. Bank*, 277 S.W.3d at 386–87). Where a policy is genuinely ambiguous, exclusions and limitations in insurance policies "must be construed against the insurance company and in favor of the insured." *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991). A policy's limitations, however, should not "be so narrowly construed as to defeat their evident purpose." *Capitol Indem. Corp. v. Braxton*, 24 F. App'x 434, 439 (6th Cir. 2001) (citation omitted).

The insurance policy at issue in this case permitted Retina Center to recover for lost income caused by "the termination or cancellation of all or any material part of a business relationship between Insured and a Key Referral Source as a result of . . . the cessation or suspension of the business operations of such Key Referral Source for a period no less than 60 days." Oxford argues that the plain meaning of the words "termination" and "cancellation" requires a permanent end to a relationship, not merely a temporary suspension.[2] As the Supreme Court has observed, "[t]he

---

[2] Retina Center makes much of the fact that, during the parties' dispute over Retina Center's insurance claim, Oxford allegedly conceded that this language was ambiguous. Oxford disputes that characterization

14

word 'terminate' ordinarily means 'put an end to.'" *Mac's Shell Serv., Inc. v. Shell Oil Prod. Co. LLC*, 559 U.S. 175, 182–83 (2010) (quoting Webster's New International Dictionary 2605 (2d ed. 1957); citing The Random House Dictionary of the English Language 1465 (1967)). Cancel is, at least in the relevant respects, largely a synonym for "to terminate." CANCEL, Black's Law Dictionary (11th ed. 2019). The insurance policy itself, moreover, clearly recognizes that "suspension" is a distinct, time-limited concept that can be evoked where appropriate, because the policy uses "cessation or suspension" elsewhere in the same provision. Oxford's reading of the plain language of the policy therefore appears to be correct.

Retina Center argues that, even if the court is inclined to agree with Oxford about the general definition of "termination," the policy's reference to 60-day suspensions should be read, in context, to suggest that such a suspension counts as a termination under the policy. As Oxford points out, however, that is not what the policy actually says. A policy easily could be written to define "termination" to include a suspension of operations for 60 days or more. This policy, however, did not do that. Rather, it provides coverage for the "termination or cancellation of all or any material part of a business relationship between Insured and a Key Referral Source," if that termination of the relationship occurred "*as a result of* . . . the cessation or suspension of the business operations of such Key Referral Source for a period [of] no less than 60 days." (Doc. No. 1-1 at 22–23 (emphasis added).) Read according to the plain meaning of the words, that provision covers lost income from a termination that is *caused by* a 60-day suspension, but it does not call on the insurer to pay for income lost due merely to the suspension itself, if no termination actually occurred.

---

of its statement that "reasonable minds" could "disagree" on the matter at issue. (*See* Doc. No. 1 ¶ 40; Doc. No. 31 at 12; Doc. No. 31-2 at 39; Doc. No. 33 at 5.) Regardless, nothing about the parties' statements at that stage has any bearing on the court's construction of the policy's language as a matter of law.

15

Such a reading makes sense in the context of the broader coverage provision. The policy notably does not cover every termination of a referral relationship. It covers only those terminations that were either (1) wrongful or (2) caused by one of the expressly enumerated causes. Many of the listed causes, however, are not events that would necessarily entail a lost referral relationship. For example, the policy covers a loss of referrals caused by "the bankruptcy of [a] Key Referral Source." (*Id.* at 23.) But a Key Referral Source could declare some forms of bankruptcy while still continuing its business relationship with the insured. The list of covered causes for the required "termination or cancellation," therefore, cannot be read as a list of items that automatically trigger the provision's coverage *in and of themselves*. The provision covers referrals lost due to the termination of all or part of a business relationship *as a result of* a bankruptcy, just as it says it does. The same basic construction of the provision would apply to suspended operations as well. The policy covers referrals lost due to the termination of all or part of a business relationship *as a result of* suspended operations; the termination/cancellation itself, however, is the triggering event for coverage.

Such a structure, moreover, makes sense. The purpose of the coverage for lost referrals was to compensate Retina Centers for the referrals it *lost*, not for referrals that were merely deferred until the referrer's business resumed. If the policy compensated Retina Center for the fact that it did not receive referrals for the relevant 60+ days, yet all of the referrers resumed operations and referred their patients to Retina Center at a later date regardless, Retina Center would enjoy a double recovery. The stated purpose of the provision, however, was to offset an actual loss, not a delay. Oxford's denial of the claim based on its conclusion that the referral relationships were not terminated was therefore consistent with the "Loss of Referrals" provision, and Retina Center's claims will be dismissed.

16

## III. CONCLUSION

For the foregoing reasons, Oxford's Motion for Judgment on the Pleadings (Doc. No. 22) will be granted, and the court will grant Oxford judgment in its favor as to all claims.

An appropriate order will enter.

                                                             ALETA A. TRAUGER
                                                             United States District Judge